UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT SMIT,

        Plaintiff,                                      Hon. Ellen S. Carmody

v.                                                      Case No. 1:09 CV 213

PAULA MEYER, et al.,

        Defendants.

_____/

## OPINION

This matter is before the Court on <u>Defendants' Motion to Dismiss and for Summary Judgment</u>. (Dkt. #27). On July 1, 2009, the parties consented to proceed in this Court for all further proceedings, including trial and an order of final judgment. *See* 28 U.S.C. § 636(c)(1). By Order of Reference, the Honorable Janet T. Neff referred this case to the undersigned. (Dkt. #9). For the reasons articulated below, Defendants' motion is **granted** and Plaintiff's action **dismissed**.

## BACKGROUND

The following allegations are contained in Plaintiff's complaint. (Dkt. #1). The events giving rise to this action occurred while Plaintiff was incarcerated at the Pugsley Correctional Facility. As of May 22, 2008, Plaintiff was employed in the weight room. On this date, Plaintiff lifted some weights from the floor, immediately after which he "felt a sharp, hot pain in his back that radiated down

his leg." On May 24, 2008, Plaintiff was examined by an unidentified nurse who "administered a shot of toroidal."[1]

On June 6, 2008, Plaintiff was first examined by Nurse Practitioner, Paula Meyer. Plaintiff reported that he was experiencing "severe, radiating low back pain with leg pain and numbness." Plaintiff requested x-rays or an MRI and, furthermore, to be examined by a physician. Meyer denied Plaintiff's request, concluding that such were "not warranted." Plaintiff was examined by Nurse Meyer on three occasions between June 10, 2008, and June 24, 2008. Plaintiff's requests for "diagnostic measures and doctor's care" were again denied by Nurse Meyer. On June 24, 2008, Plaintiff's legs "went totally numb and he collapsed in his cell." Plaintiff was taken to a hospital where he underwent "emergency" back surgery.

Plaintiff initiated this action on March 10, 2009, against Nurse Meyer and Correctional Medical Services (CMS). Plaintiff alleges that Defendant Meyer violated his right to be free from cruel and unusual punishment. Plaintiff also alleges that Defendant Meyer was grossly negligent in violation of Michigan law. Plaintiff further alleges that CMS violated his constitutional rights by having in place "policies, customs, training and practice[s]" which constituted deliberate indifferent to his serious medical needs. Defendants now move for dismissal of Plaintiff's claims and for summary judgment. For the reasons discussed below, the Court grants Defendants' motion and dismisses Plaintiff's action.

---

[1] The Court can find no reference to a drug named "toroidal." Plaintiff may instead be referring to Toradol, a drug used to treat "moderate to severe pain." *See* Toradol, available at: http://www.drugs.com/toradol.html (last visited on Oct. 15, 2010).

# SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party moving for summary judgment can satisfy its burden by demonstrating "that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005); *see also*, *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The fact that the evidence may be controlled or possessed by the moving party does not change the non-moving party's burden "to show sufficient evidence from which a jury could reasonably find in her favor, again, so long as she has had a full opportunity to conduct discovery." *Minadeo*, 398 F.3d at 761 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)).

Once the moving party demonstrates that "there is an absence of evidence to support the nonmoving party's case," the non-moving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial." *Amini*, 440 F.3d at 357 (citing *Anderson*, 477 U.S. at 247-48; *Celotex Corp. v. Catrett*, 477 U.S. at 324). While the Court must view the evidence in the light most favorable to the non-moving party, the party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Amini*, 440 F.3d at 357. The existence of a mere "scintilla of evidence" in support of the non-moving party's position is insufficient. *Daniels v. Woodside*, 396 F.3d 730, 734-35 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252). The non-moving party "may not rest upon [his] mere

allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.*, 434 F.3d 810, 813-14 (6th Cir. 2006) (citations omitted).

Moreover, the non-moving party cannot defeat a properly supported motion for summary judgment by "simply arguing that it relies solely or in part upon credibility determinations." *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004). Rather, the non-moving party "must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and. . .may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Id.* at 353-54. In sum, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Daniels*, 396 F.3d at 735.

While a moving party without the burden of proof need only show that the opponent cannot sustain his burden at trial, *see Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *Minadeo*, 398 F.3d at 761, a moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). "Where the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). The Sixth Circuit has repeatedly emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no

reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000); *Cockrel*, 270 F.2d at 1056 (same). Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

## ANALYSIS

**I.      Defendant CMS**

Plaintiff alleges that Defendant Meyer's decision to deny his requests for an MRI and to be examined by a physician were "the result of the well-settled policies, customs, training and practice of CMS." Plaintiff asserts that "CMS's policies, customs, training and practice constituted deliberate indifference to [his] serious medical needs." Plaintiff further alleges that CMS "was aware of prior Constitutional violations by its employees and failed to take corrective action." Defendants assert that they are entitled to relief as to this claim. In his response to the present motion, Plaintiff does not address this particular issue.

CMS is not vicariously liable for the actions of its employees and, therefore, "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)); *Street v. Corr. Corp. of America*, 102 F.3d 810, 818 (6th Cir. 1996); *Starcher v. Correctional Medical Systems, Inc.*, 7 Fed. Appx. 459, 465 (6th Cir., Mar. 26, 2001). To establish liability against CMS, Plaintiff must demonstrate that he suffered a violation of his federal rights "because of" a CMS policy, practice, or custom. *See Thomas*, 398 F.3d at 429.

To establish the existence of a policy, practice, or custom based on an allegation that CMS failed to act, as is the case here, Plaintiff must demonstrate the following: (1) the existence of a "clear and persistent pattern" of illegal activity; (2) that CMS had notice or constructive notice of such; (3) that CMS tacitly approved of the illegal activity, such that "their deliberate indifference in their failure to act can be said to amount to an official policy of inaction" and (4) that the policy, practice, or custom in question was the "moving force" or "direct causal link" in the constitutional deprivation. *Id.* at 429 (quoting *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996)).

In his complaint, Plaintiff offers nothing but the repeated legal conclusion that his constitutional rights were violated by "CMS's policies, customs, training and practice." Plaintiff offers no factual allegations to support his claim. Thus, his claim against CMS is, at best, purely speculative and as such fails to state a claim on which relief may be granted. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) (a complaint states a claim only where the "[f]actual allegations [are] enough to raise a right for relief above the speculative level on the assumption that all of the complaint's allegations are true"); *Ashcroft v. Iqbal*, ____ U.S. ____, 129 S.Ct. 1937, 1949 (2009) ("where the wellpleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' - 'that the pleader is entitled to relief'").

Moreover, even if the Court assumes that Plaintiff's complaint properly articulates a claim against CMS, the result is the same. As previously noted, if a party moves for summary judgment as to a claim regarding which they do not have the burden of proof, they are entitled to relief upon a showing that their opponent has failed to submit or identify evidence sufficient to sustain his burden at trial. As Defendant correctly observes, Plaintiff, after having more than 18 months to gather evidence,

has failed to submit *any* evidence from which a reasonable juror could find for Plaintiff on this claim. Thus, Defendants are, in the alternative, entitled to summary judgment as to this claim.

II.           **Plaintiff's Eighth Amendment Claim against Defendant Meyer**[2]

Plaintiff asserts that Defendant Meyer was "deliberately indifferent to [his] serious medical need" in violation of his Eighth Amendment right to be free from cruel and unusual punishment. Defendant Meyer asserts that she is entitled to summary judgment because Plaintiff has established nothing more than the fact that he disagrees with the medical treatment he received. The Court agrees.

The Eighth Amendment's prohibition against cruel and unusual punishment applies not only to punishment imposed by the state, but also to deprivations which occur during imprisonment and are not part of the sentence imposed. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Estelle v. Gamble*, 429 U.S. 97, 101-02 (1976). Accordingly, the Eighth Amendment protects against the unnecessary and wanton infliction of pain, the existence of which is evidenced by the "deliberate indifference" to an inmate's "serious medical needs." *Estelle*, 429 U.S. at 104-06; *Napier v. Madison County, Kentucky*, 238 F.3d 739, 742 (6th Cir. 2001).

The analysis by which an official's conduct is evaluated consists of two-steps. First, the Court must determine, objectively, whether the alleged deprivation was sufficiently serious. In this respect, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. If the objective test is met, the Court must then determine whether the official possessed a sufficiently culpable state of mind:

---

[2] In resolving Defendants' motion for summary judgment, the Court has considered the affidavit executed by Dr. Paul Davis. (Dkt. #47). The Court is aware that Defendants have moved to strike Dr. Davis' affidavit. (Dkt. #39). The Court, however, finds it unnecessary to resolve this particular issue, as Dr. Davis' affidavit does not advance Plaintiff's cause in this matter.

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837.

In other words, Plaintiff must establish that the official "actually knew" that he "faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it." *Howard v. Calhoun County*, 148 F.Supp.2d 883, 888-89 (W.D. Mich. 2001) (citing *Farmer*, 511 U.S. at 847).

To the extent, however, that Plaintiff merely disagrees with the treatment Defendant provided or asserts that he received negligent care, Defendant is entitled to relief. *See, e.g., Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976)) ("[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner"); *Dotson v. Phillips*, 2010 WL 2776875 at *3 (6th Cir., July 12, 2010) (same); *Brown v. Kashyap*, 2000 WL 1679462 at *1 (6th Cir., Nov. 1, 2000) (citing *Estelle*, 429 U.S. at 106) ("allegations of medical malpractice or negligent diagnosis and treatment" do not implicate the Eighth Amendment).

The medical evidence submitted by the parties reveals the following.[3] On May 24, 2008, Plaintiff was examined by Denice Weeks, R.N. (Dkt. #27, Exhibit A at 147-48[4]). Plaintiff reported that he was "lifting an item in weight pit[5] 2 days ago and felt [a] pop" in his right lower back. *Id.* at 147.

---

[3] While the opinion cites to the records submitted by Defendants, Plaintiff has submitted much of the same material. (Dkt. #42-46, 48).

[4] The page number refers to the Bates number in the lower right hand corner of this exhibit.

[5] Plaintiff asserts in his complaint that he was employed in the weight room. (Dkt. #1). Plaintiff has also asserted in an affidavit that he was employed in the weight room as a "weight pit porter" performing various duties including "picking up and

An examination revealed that Plaintiff's back was "very tender." Plaintiff was given a Toradol shot and instructed to use Motrin and ice. *Id.* On May 27, 2008, Plaintiff was examined by Lois Darrow, R.N. *Id.* at 145. Plaintiff reported that his "pain is better." An examination revealed no evidence of numbness or tingling in Plaintiff's feet. Plaintiff reported that he was experiencing "no difficulty with voiding or BM's." Plaintiff was instructed to continue using Motrin and a HWB (hot water bottle) as needed. *Id.*

On June 1, 2008, Plaintiff was examined by Shayne Scott, R.N. *Id.* at 142. Plaintiff reported that his current treatment did "help" his pain. *Id.* On June 3, 2008, Plaintiff was examined by Carol Clous, R.N. *Id.* at 136, 138. Plaintiff reported that his medications were "now not as effective." *Id.* at 138. Plaintiff reported that he was not experiencing any weakness or loss of bowel or bladder control. On examination, Plaintiff exhibited muscle spasms, but "full range of motion with no weakness present." *Id.* Plaintiff's medications were modified. *Id.* at 136. Treatment notes completed later that day reveal that Plaintiff "is ambulating around unit for rest room and to drinking fountain." *Id.* at 134.

On June 5, 2008, Plaintiff was examined by Edward Pearson, R.N. *Id.* at 127-28. Plaintiff reported that he was continuing to experience low back pain with numbness radiating into his right lower extremity. *Id.* at 127. Plaintiff reported that he was experiencing difficulty standing and performing activities of daily living, but denied experiencing loss of bowel or bladder control. *Id.* at 127. Plaintiff's back was "tender to touch" and his leg strength and mobility were "slightly decreased." Plaintiff ambulated "slowly," but was "able to support [his] weight without difficulty." *Id.* Plaintiff was given an injection of Toradol, as well as prescriptions for Ultram and Flexeril. *Id.* at 128.

---

racking weights." (Dkt. #34, Exhibit 1).

On June 6, 2008, Plaintiff was examined by Defendant Meyer. *Id.* at 122-23. Plaintiff reported that he was experiencing "severe" low back pain that radiated into his right leg. *Id.* at 122. Plaintiff reported that he had obtained "some relief with rest," but that his pain was nevertheless "progressively worsening." Straight leg raising was positive on the right, but clonus[6] was negative. Defendant Meyer observed that Plaintiff appeared to be "in obvious discomfort." Plaintiff's medication regimen was modified and he was instructed to continue "walking in unit." Plaintiff was "amenable to plan." *Id.* Treatment notes dated June 7, 2008, indicate that Plaintiff was not taking his medications as prescribed. *Id.* at 121.

On June 10, 2008, Plaintiff was examined by Defendant Meyer. *Id.* at 118-19. Plaintiff reported that he was "not feeling any improvement." *Id.* at 118. Defendant Meyer reported that this was "due to [Plaintiff] taking prednisone inappropriately." Plaintiff reported that he was not experiencing any loss of bladder or bowel control. Straight leg raising was positive on the right, but clonus was negative. Defendant Meyer noted that the results of this examination were "improved. . .from 4 days ago." Plaintiff's medications were again modified. Defendant Meyer reported that "if not significantly improved at end of steroid taper will consider need for MRI." *Id.* Treatment notes dated June 11, 2008, reveal that Plaintiff was "lying on bunk with head propped up on pillow watching TV." *Id.* at 117. It was further reported that Plaintiff "sat up right without any difficulty and took pills" and "laid from sitting to flat without any difficulty." *Id.*

On June 20, 2008, Plaintiff was examined by Defendant Meyer. *Id.* at 109. Plaintiff reported that his "pain had completely resolved but returned to work then awoke next day with severe

---

[6] Clonus is "repetitive, rhythmic contractions of a muscle when attempting to hold it in a stretched state." Clonus, available at, http://www.mult-sclerosis.org/clonus.html (last visited on October 25, 2010). Clonus is "a strong, deep tendon reflex that occurs when the central nervous system fails to inhibit it." It is "initiated in the spinal cord and is usually a sign of damage to the nerve tracts above the place where it is initiated." *Id.*

low back pain radiating down both legs." Plaintiff denied experiencing any loss of bladder or bowel control. Straight leg raising was positive on the right, but clonus was negative. Plaintiff's medication regimen was again modified. Defendant Meyer also discussed with Dr. Harriet Squier whether an MRI was needed. Dr. Squire recommended that if Plaintiff's condition "deteriorates will consider requesting MRI." *Id.*

On June 23, 2008, Plaintiff was examined by Nurse Pearson. *Id.* at 105-06. Plaintiff reported that his "pain had resolved and then woke up this a.m. with excruciating pain." *Id.* at 105. Plaintiff exhibited "impaired" mobility, but denied experiencing loss of bowel or bladder control. *Id.* Plaintiff was given another injection of Toradol and "instructed to ambulate and do stretching exercises." *Id.* at 106.

On June 24, 2008, Plaintiff was discovered laying on his right side. *Id.* at 94. Plaintiff reported that he fell after experiencing "severe" back spasms and "sharp" pain. *Id.* Plaintiff was immediately taken by ambulance to a local hospital. *Id.* at 95. The results of an MRI revealed that Plaintiff was experiencing "significant spinal canal narrowing at the L4-5 and L2-3 levels, as well as a partial cauda equina type syndrome[7] involving both lower extremities due to high-grade stenosis at L4-5." (Dkt. #27, Exhibit D at 62-63). The following day Plaintiff underwent lumbar decompression surgery performed by Dr. Paul Davis. *Id.* at 64-66.

As the medical evidence reveals, Plaintiff has established (and Defendants do not dispute) that he was experiencing a serious medical condition, thus satisfying the objective prong of the analysis. Defendant Meyer is entitled to summary judgment, however, because Plaintiff has failed to produce any

---

[7] Cauda equina syndrome is a "serious condition caused by compression of the nerves in the lower portion of the spinal canal." Cauda Equina Syndrome, available at http://www.emedicinehealth.com/cauda_equina_syndrome/article_em.htm (last visited on October 18, 2010). If left untreated, cauda equina syndrome "can lead to permanent loss of bowel and bladder control and paralysis of the legs." *Id.*

evidence that Meyer was *actually* aware that Plaintiff's condition was possibly more serious than she determined or that her treatment was in any way deficient or inappropriate. In short, the evidence reveals that Defendant Meyer provided Plaintiff with the medical treatment that she believed in her professional judgment was warranted. While Plaintiff *may* be able to establish that Defendant Meyer was negligent or committed malpractice, such simply does not implicate the Eighth Amendment.

As noted above, Defendant Meyer first examined Plaintiff on June 6, 2008, and then examined him on three occasions between June 10, 2008, and June 24, 2008. Plaintiff's position is that Defendant Meyer *actually knew*, following her initial examination and every examination thereafter, that Plaintiff was suffering nerve damage necessitating "emergency surgery." Plaintiff contends that Meyer's failure to order an MRI or refer him to a specialist establishes that she was deliberately indifferent to his serious medical needs. The evidence simply does not support this argument.

At her deposition, Defendant Meyer testified that nerve root impingement can constitute a serious medical condition that may require surgical intervention. (Dkt. #27, Exhibit B at 26-27, 34-35, 42). Meyer testified that "the four cardinal symptoms of nerve root injury" were foot drop, loss of bladder or bowel control, perineal numbness, and a loss of cremasteric reflex. *Id.* at 27-31. Meyer testified that had Plaintiff exhibited any of these symptoms, she would have recommended that he receive "additional specialty services." *Id.* at 98-100. Defendant Meyer testified that Plaintiff did not exhibit any of these symptoms. *Id.* at 98-109. Meyer's testimony is supported by the medical evidence submitted by the parties.

Plaintiff makes much of his belief that the symptoms he displayed to Meyer were not inconsistent with the conclusion that he was suffering a nerve root injury necessitating immediate surgery. As Defendant Meyer testified, however, Plaintiff's symptoms were also consistent with muscle

spasm, inflammation, and sciatic nerve irritation. *Id.* at 62, 77. Meyer further testified that the results of her examinations of Plaintiff "rule[d] out a herniated disc putting significant pressure on a nerve." *Id.* at 70-73. Nevertheless, Meyer recognized that Plaintiff was experiencing a serious medical condition. She diagnosed Plaintiff with "acute lumbosacral strain with radiculopathy," for which she prescribed "conservative treatment in a fairly aggressive manner." *Id.* at 74-80.

As previously noted, following her June 20, 2008 examination of Plaintiff, Defendant Meyer consulted with Dr. Harriet Squire as to whether an MRI was warranted. Dr. Squire testified that during the relevant time period she was employed by CMS as the associate medical director for utilization management. (Dkt. #27, Exhibit C at 14-15). As such, Dr. Squire was responsible for "reviewing medical charts and determining the necessity of trips out of the system for specialist care or testing." *Id.* at 15. Dr. Squire testified that if an individual was experiencing muscle weakness (i.e., foot drop), perineal numbness, lack of cremasteric reflex, or loss of bladder or bowel control, emergency surgery would be necessary. *Id.* at 28, 37, 58. The doctor testified that Defendant Meyer informed her that Plaintiff did not exhibit any of these symptoms, which a review of the medical record by Dr. Squire confirmed. *Id.* at 37. Dr. Squire testified that when she spoke with Defendant Meyer concerning Plaintiff, she informed Meyer that an MRI was not warranted at that point. *Id.* at 44. Dr. Squire further testified that Defendant Meyer's treatment of Plaintiff was appropriate. *Id.* at 50, 59.

Plaintiff believes that his condition necessitated surgery as of May 22, 2008, when he felt a "pop" in his back after lifting something. As noted above, however, Plaintiff reported to Defendant Meyer on June 20, 2008, that his pain had "completely resolved," only to return after resuming his work activities. Defendant Meyer testified that this was "significant" because "if there is significant nerve involvement, it's not something that just goes away." (Dkt. #27, Exhibit C at 83). Dr. Squire reached

the same conclusion on this question. (Dkt. #27, Exhibit C at 67). Dr. Squire further testified that, in her opinion, the injury that necessitated Plaintiff's surgery occurred on June 24, 2008, when Plaintiff fell in his cell. *Id.* at 40-41. Specifically, the doctor testified that prior to June 24, 2008, "there were absolutely no neurologic findings supporting nerve impingement" and that "a fall would be the kind of event that could lead to an acute disc herniation." *Id.*

In support of his position, Plaintiff has submitted an affidavit from Dr. Paul Davis, who performed his June 25, 2008 back surgery. (Dkt. #47). This affidavit fails to advance Plaintiff's cause. The doctor asserts that "if [Plaintiff] were experiencing lack of leg power (i.e., muscle weakness) on June 6 and/or June 10 of 2008, he more likely than not was experiencing L5 and S1 nerve impingement or damage that required emergent surgical intervention." First, the doctor is engaging in pure speculation. Also, as previously discussed, the record contains no evidence that Plaintiff was experiencing lack of leg power or muscle weakness on June 6, 2008, or June 10, 2008. Furthermore, even if Plaintiff was experiencing a lack of leg power or muscle weakness on the dates in question, there is no evidence that Defendant Meyer was aware of such.

Dr. Davis also expresses his belief that the injury which necessitated Plaintiff's surgery "was the result of the injury [Plaintiff] sustained when lifting a dumbbell." Putting aside the fact that the doctor fails to indicate the date on which this alleged injury occurred,[8] the doctor is engaging in pure after the fact speculation. More importantly, even assuming the doctor's speculation is accurate, there is no evidence that Defendant Meyer knew such was the case. Thus, this evidence, at most, supports an argument for negligence or malpractice, neither of which implicate the Eighth Amendment. Dr. Davis further asserts that Plaintiff should have undergone an MRI following his June 6, 2008, or June

---

[8] The failure in this regard is not insignificant given the evidence that Plaintiff reported on June 20, 2008, that his pain had completely resolved only to return after resuming his work duties in the weight pit.

10, 2008 examinations. The doctor further asserts that had Plaintiff undergone an MRI at such time, "it would have shown a possible need for surgical intervention." Again, this is pure speculation and, at most, demonstrates that Defendant Meyer was negligent or committed malpractice.

The essence of Plaintiff's claim is that Defendant Meyer should have ordered an MRI or other specialized services after examining him. Defendant Meyer detailed in her deposition why, in her professional judgment, an MRI was not warranted. Her testimony in this regard is supported by the medical evidence and Dr. Squire's testimony. Plaintiff has presented no evidence that Defendant Meyer actually knew that Plaintiff's medical condition necessitated more extensive or more aggressive treatment than she (and other medical professionals) were already providing. In sum, Plaintiff received medical care that Defendant Meyer (and his other care providers) believed was appropriate to the circumstances. While Plaintiff may believe that Defendant Meyer committed negligence or malpractice, such does not implicate the Eighth Amendment. Accordingly, Defendant Meyer is entitled to summary judgment as to Plaintiff's Eighth Amendment claim.

### III. Plaintiff's State Law Claim against Defendant Meyer

Plaintiff further asserts that Defendant Meyer breached the duty she owed to Plaintiff and committed gross negligence causing him injury. Defendant Meyer asserts that she is entitled to relief as to this claim. For the reasons articulated below, the Court agrees.

Michigan law articulates certain requirements that must be satisfied before an individual can assert a claim for medical malpractice. For example, before a person may initiate a medical malpractice action he must first provide the health professional or health facility against whom the action is asserted with written notice of intent to file a claim. *See* Mich. Comp. Laws § 600.2912b.

Furthermore, the plaintiff in an action alleging medical malpractice must file with his complaint an affidavit of merit executed by a health professional. *See* Mich. Comp. Laws § 600.2912d.

A plaintiff cannot avoid these requirements simply by labeling his medical malpractice claims as "negligence" claims. *See, e.g., Sibley v. Borgess Medical Center*, 2008 WL 2744618 at *3 (Mich. Ct. App., July 15, 2008) (citations omitted). To assess whether a plaintiff's claims of negligence are properly characterized as medical malpractice claims subject to the aforementioned procedural requirements, the Court conducts a two-step inquiry. The Court first must determine whether the claim in question "pertains to an action that occurred within the course of a professional relationship." *Bryant v. Oakpointe Villa Nursing Centre, Inc.*, 684 N.W.2d 864, 871 (Mich. 2004). The Court next asks whether the claim in question "raises questions of medical judgment beyond the realm of common knowledge and experience." If these questions are both answered in the affirmative, the claims are subject to the aforementioned requirements applicable to medical malpractice claims. *Id.* Furthermore, failure to comply with these requirements requires the dismissal of the plaintiff's medical malpractice claims. *See Burton v. Reed City Hospital Corp.*, 691 N.W.2d 424, 429 (Mich. 2005).

With respect to the first question, a professional relationship exists "if a person or entity capable of committing medical malpractice was subject to a contractual duty to render professional health-care services to the plaintiff." *Kuznar v. Raksha Corp.*, 750 N.W.2d 121, 126 (Mich. 2008). Defendant Meyer is capable of committing malpractice under Michigan law. *See* Mich. Comp. Laws § 600.5838a(1), 333.17208; *see also*, *In re Estate of Miles*, 2007 WL 914743 at *5 (Mich. Ct. App., Mar. 27, 2007). Moreover, Defendant Meyer owed a duty to Plaintiff to provide him with professional health-care services. Plaintiff's negligence claims, therefore, clearly "occurred within the course of a professional relationship." As for the latter question, the Court finds that Plaintiff's negligence claims

raise questions of medical judgment which lay "beyond the realm of common knowledge and experience."

The Court concludes, therefore, that Plaintiff's state law negligence claim against Defendant Meyer is properly characterized as a medical malpractice claim. The Court further concludes that Plaintiff's medical malpractice claim must be dismissed for Plaintiff's failure to submit with his complaint an affidavit of merit executed by a health professional, as required by Michigan law.

## CONCLUSION

For the reasons articulated herein, <u>Defendants' Motion to Dismiss and for Summary Judgment</u>, (dkt. #27), is **granted** and Plaintiff's action **dismissed**. An Order consistent with this Opinion will enter.


Date: October 27, 2010              /s/ Ellen S. Carmody
                                    ELLEN S. CARMODY
                                    United States Magistrate Judge